J-S23032-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.F.W., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: T.A.W., MOTHER | : : : : : : | |
| | : | No. 2736 EDA 2017 |

Appeal from the Order Entered August 17, 2017
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0000675-2017

BEFORE: SHOGAN, J., NICHOLS, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.: **FILED MAY 30, 2018**

Appellant, T.A.W. ("Mother"), files this appeal from the order dated and entered August 17, 2017, in the Philadelphia County Court of Common Pleas, granting the petition of the Philadelphia Department of Human Services ("DHS") and involuntarily terminating Mother's parental rights to her minor daughter, J.F.W. ("Child"), born in January 2017, pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(2), and (b).[1, 2] After review, we affirm.

---

[1] By separate order dated and entered August 18, 2017, the court confirmed consent to and voluntarily terminated the parental rights of R.C. ("Father") with respect to Child. Father did not file an appeal and is not a party to the instant appeal.

[2] While Mother suggests that she is additionally appealing from the order changing Child's permanency goal to adoption, Mother fails to include the docket number associated with the goal change on her notice of appeal. Moreover, any such opposition would be waived as Mother failed to include this issue in the Statement of Questions Involved section of her brief and failed

---

\* Former Justice specially assigned to the Superior Court.

The trial court has summarized the relevant procedural and factual history, in part, as follows:

> The family of J.F.W. has been known to [DHS] since September 17, 2013[,] when DHS received a General Protective Services (GPS) report, regarding J.F.W., Mother, and older siblings. The GPS report alleged that Mother took the older siblings from Philadelphia to Phoenix, Arizona in August [of] 2013 to place another sibling in adoption. Mother was committed for in-patient mental health treatment upon her arrival in Arizona.
>
> Mother was diagnosed with mood disorder with psychotic features, auditory hallucinations, depression and suicidal ideations[.] Mother signed herself out of treatment against medical advice. [J.F.W.]'s siblings were placed in foster care through the Maricopa County, Arizona Children and Youth Department; Mother refused child welfare services and visitation, and instead returned to Philadelphia, Pennsylvania, leaving the children in Arizona foster care. The report also alleged that Mother had a history of aggression and domestic violence towards the siblings'[] Father. This report was substantiated by DHS, along with findings of lack of appropriate supervision by Mother.
>
> On February 5, 2014, DHS revised a [GPS] report in relation to this family, which echoed the allegations in [the] September 17, 2013[,] GPS report, and further stated that the Honorable Kevin Dougherty of Philadelphia's Family Court had issued the transfer of jurisdiction of [J.F.W.]'s siblings to Philadelphia, Pennsylvania.

---

to present argument as to this issue in her brief. ***See Krebs v. United Refining Co.***, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); ***see also In re W.H.***, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (quoting ***In re A.C.***, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); ***see also In re M.Z.T.M.W.***, 163 A.3d 462, 465-66 (Pa.Super. 2017).

On February 5, 2014, DHS met with Mother at a home where she resided with the children's [m]aternal [g]randmother.

DHS determined that Maternal Grandmother was not an appropriate visitation or kinship resource for the children, as she failed the kinship clearance process due to prohibitive convictions for aggravated assault.

On February 10, 2014, DHS obtained an Order of Protective Custody (OPC) for J.F.W.'s siblings and brought them back to Philadelphia.

At [J.F.W.]'s siblings' Shelter Care Hearing held on February 10, 2014[,] Mother admitted that she had taken the children to Phoenix, Arizona to place [J.F.W.]'s sibling for adoption with the Mother Goose Adoption Agency in August [of] 2013. Mother denied that she had suffered from auditory hallucination[s] and suicidal ideations, instead [she] informed the [c]ourt that she had expected to receive Three Thousand Dollars ($3,000.00) by placing [J.F.W.]'s sibling for adoption.

On February 12, 2014, the Honorable Kevin Dougherty suspended visitation between Mother and J.F.W.'s siblings finding that Mother's mental instability presented a grave threat of harm to the children. Mother's visitation remained suspended throughout the course of J.F.W.'s siblings' dependency cases.

On March 6, 2014, the [c]ourt issued emergency protection orders for the Catholic Community Service CUA social workers assigned to J.F.W.'s cases[,] which forbade Mother and Maternal Grandmother from engaging in any threatening or harassing behaviors towards the social work team.

On March 26, 2014, Mother participated in a forensic psychological/parenting capacity evaluation (PCE) with IQ testing, conducted by William Russell, Ph.D. of Assessment and Treatment Alternatives (ATA) to assess her ability to provide safety and permanency to J.F.W.'s siblings.

Mother's PCE results placed her in the below average ranges for Verbal IQ (73) and Nonverbal IQ (74). Her IQ Composite was in the lower extreme range of 69. The scores indicated that Mother's struggles on areas of verbal concept formation, reasoning abilities, general information, and problem-solving[.]

The PCE report further stated Mother's Child Abuse Potential inventory results reflected significant elevations on the Abuse Scale "Mother had an array of personal and interpersonal characteristics that are similar to characteristics of known physical child abusers, further indicating an increased risk of child abuses." Her results also showed significant elevations on the Distress, Rigidity, Unhappiness, Problems with Family, and Problems for Others scales[.]

Upon interview, Mother denied auditory and visual hallucinations, despite a past recorded history of psychotic symptoms. The report indicated Mother demonstrated current symptoms of paranoia, endorsed problems with sleep, and denied her children's known developmental delays. Mother was unable to identify positive changes she had made in her life to facilitate reunification.

Dr. Russell diagnosed Mother with Bipolar I Disorder, most recent episode Mixed with Severe Psychotic Features.

Dr. Russell in his report opined "Mother demonstrated absolutely no insight into her current mental health problems and was unable to demonstrate any insight into her mental state just prior to being hospitalized, despite reports that she was experiencing auditory hallucinations, suicidal, and homicidal ideation." He further opined that "despite being involved in treatment; Mother was not addressing these issues in therapy. Moreover, she expressed little desire to continue engaging in treatment. Additional records reflect that Mother used her auditory hallucinations as an excuse for a vacation and did not appear to understand the gravity of her statements and the impact they had on her children's wellbeing and safety. Presently, Mother minimized the severity of the situation and did not recognize that she had any problems. Additionally, Mother presented with a limited understanding about the importance of housing in the long-term safety and stability of her children. Thus, there are continued concerns about Mother's ability to provide safety and permanency to her children at this time."

Recommendations included participation in mental health treatment with licensed clinicians experienced with mood disorder; an appropriate independent housing plan; engagement in available community resources; and available parenting classes for individuals with cognitive limitations.

On July 18, 2014, Mother completed a Psychiatric Evaluation at ATA, performed by Robert Hall, M.D. Dr. Hall diagnosed Mother

- 4 -

with Mood Disorder. Dr. Hall found that Mother was suffering from moderate-severe psychiatric disturbance, and noted that Mother denied taking any of the psychiatric medications that she was prescribed, in the past and at present. Dr. Hall opined that it was medically necessary that she continue with individual therapy. He also opined she should consider an atypical antipsychotic mood stabilizing medication, either with or without anti-depressant treatment and ongoing psychiatric monitoring. He noted Mother's general opposition to such medication.

In July 2014, Mother engaged in several instances of threatening behavior toward the CUA team[.] She indicated that she had learned the names of the case manager's family, as well as the location of visitation with the children.

On September 16, 2014, a Bench Warrant was issued for Maternal [G]randmother for a violation of the protection orders that were in place for the social work team[.] Maternal Grandmother was subsequently found in Contempt of Court order by Honorable Judge Kevin [Dougherty].

On or about September 18, 2014, following an altercation with staff, Mother was discharged from Tree of Life due to her behaviors and lack of cooperation with agency protocols. Mother failed to disclose this information to DHS or the [c]ourt at the September 20, 2014[,] hearing, and instead asserted that she continued to receive treatment at Tree of Life.

Mother was referred to ATA for mental health services in October 2014, however failed to attend weekly sessions at ATA until November 18, 2014[,] when she re-engaged in treatment. After she re-engaged, Mother informed her therapist she was participating in the New Beginning surrogacy program in New York and the program was paying for her transportation and prenatal appointment.

On January 20, 2015, at a Permanency Review Hearing for J.F.W.'s siblings, the Honorable Judge Fernandes issued a stay away order protecting the CUA case man[a]ger, the entirety of DHS, the assigned solicitor and the assigned child advocate. The [c]ourt specifically ordered Mother and Maternal Grandmother and all maternal relatives to refrain from threatening or contacting any parties on the case. Mother was ordered to communicate with CUA through her counsel. A home assessment of Mother's residence was ordered, with police assistance.

On October 5, 2015, the parental rights of Mother were involuntarily terminated to J.F.W.'s siblings, by order of the Honorable Joseph Fernandes, based on Mother's repeated and continued incapacity and inability to provide safety and permanency to J.F.W's siblings.

On June 9, 2016, the Superior Court of Pennsylvania affirmed the termination of Mother's parental rights to J.F.W.'s siblings.

On January 29, 2017, DHS received a [GPS] report while alleging that on January 29, 2017, Mother gave birth to J.F.W. At birth, J.F.W. weighed five pounds and nine ounces and was born at 36 weeks and three days gestation. The report also alleged that Mother's parental rights were terminated to two other children and that Mother had been a surrogate for a child who she stated that she wanted to harm at 33 weeks gestation, when she delivered. Mother was diagnosed with bipolar disorder, and stated that she stopped taking her prescribed medication when she learned that she was pregnant. Mother stated she was going to resume taking her medication after she delivered her baby. The report alleged that Mother stated that she was prepared to care for J.F.W. and Mother identified her residence with her mother, Maternal Grandmother, who was her primary source of support. This report was determined to be valid.

On January 30, 2017, DHS spoke to Mother, who admitted that she had been hospitalized on several occasions for mental health treatment. Mother stated that she has the support of Maternal Grandmother to assist her with J.F.W.'s care and that once her mental health had been stabilized by medication, Mother maintained that she will be able to care for J.F.W. independently.

On January 30, 2017, J.F.W. was ready for discharge. DHS obtained an OPC, and J.F.W. was placed in Catholic Social Services (CSS) in a foster home, in a confidential location.

At the Shelter Care Hearing held on February 1, 2017, the [c]ourt lifted the OPC, ordered the temporary commitment to DHS [to] stand, and referred Mother to the [Behavioral] Health System (BHS) for monitoring.

J.F.W.'s contested Adjudicatory and Aggravated Circumstances hearing was held on March 2, 2017, April 3, 2017, and May 11, 2017.

On May 11, 2017, th[e] [trial] [c]ourt, after hearing and considering the testimony of Dr. Russell, DHS[,] and Mother, as well as reviewing the mental health assessment and transcripts of record, determined that J.F.W. was a dependent child and committed her to DHS care and custody. The [c]ourt further issued an order finding the Aggravated Circumstance existed, pursuant to 42 Pa.C.S. § 6302 (Aggravated Circumstances (5)), and that DHS need not make any further reunification efforts in regards to Mother. The [c]ourt also found that visitation should be suspended until further order.

Furthermore, based on Mother's statement at the May 11, 2017 Adjudicatory Hearing, Mother lacked insight into the reasons that her parental rights to J.F.W.'s siblings were involuntarily terminated.

. . .

Trial Court Opinion ("T.C.O."), 1/16/18, at 1-5.

DHS filed a petition to involuntarily terminate Mother's parental rights on June 26, 2017.[3] The trial court held a hearing on August 17, 2017. In support thereof, DHS presented the testimony of Dr. William Russell, Ph.D, forensic psychologist;[4] and Siretta Humphrey, CUA case manager, Catholic

---

[3] DHS additionally filed a petition to involuntarily terminate Father's parental rights. However, as indicated above, Father's parental rights were eventually terminated voluntarily by order dated and entered August 18, 2017.

[4] Dr. Russell conducted a parenting capacity examination of Mother and was supervising her treatment with therapist, Ashley Guy. N.T., 8/17/17, at 11, 13-14. Dr. Russell additionally testified at the adjudicatory hearing in this matter on March 2, 2017. DHS presented this testimony as Exhibit DHS-2.

Community Services. Mother, who was present and represented by counsel, testified on her own behalf.[5]

By order entered on August 17, 2017, the trial court involuntarily terminated the parental rights of Mother to Child pursuant to 23 Pa.C.S.A. § 2511(a)(2), and (b).[6] On August 25, 2017, Mother, *pro se*, filed a notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[7]

_____

[5] Child was represented by a Child Advocate, Daniel Kurland, Esquire, during this proceeding. He participated in the questioning and argued in favor of termination of Mother's parental rights. N.T. at 43. Upon review, as best we can discern, it appears that Attorney Kurland was appointed to represent Child as the Guardian *ad litem* ("GAL") and then as legal counsel. While our Supreme Court has held that Section 2313(a) requires courts to appoint counsel to represent the legal interests of any child involved in a contested involuntarily termination proceeding, *see In re Adoption of L.B.M.*, ––– Pa. –––––, 161 A.3d 172 (2017), we have held that courts need not appoint a separate attorney to represent a child's legal interests, so long as the child's GAL was an attorney and the child's legal and best interests do not appear to be in conflict. *See In re D.L.B.*, 166 A.3d 322, 329 (Pa.Super. 2017) ("As our decision discusses, Child's best interests and legal interests were unquestionably well represented by Attorney Rowles in this case and such interests were never in conflict. Accordingly, we decline Mother's request to remand this case for the appointment of additional counsel for Child."). Here, the record does not suggest any conflict between Child's legal interests and her best interests, or that Mr. Kurland did not represent both interests adequately.

[6] This order memorialized the trial court's decision placed on the record at the hearing. N.T. at 48-52.

[7] Thereafter, on September 11, 2017, trial counsel filed a praecipe to withdraw, and Mother filed an entry of appearance *pro se*. Accordingly, by order dated September 12, 2017, this Court remanded this matter to the trial court to determine if Mother was entitled to court-appointed counsel pursuant

On appeal, Mother raises the following issues for our review:

1.    Did the Department of Human Services (DHS) sustain the burden that Mother's rights should be terminated when there was evidence that Mother had completed and/or had been actively completing her permanency goals?

2.    Was there sufficient evidence presented to establish that it was in the best interest of the child to terminate Mother's parental rights?

Mother's Brief at 4.[8]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of

_____

to 23 Pa.C.S.A. § 2313(a.1). Pursuant to order dated and entered September 20, 2017, the trial court determined that Mother was entitled to court-appointed counsel and, on the same date, the trial court appointed counsel for purposes of appeal. Counsel ultimately filed an appellate brief, which also included a Rule 1925(b) statement. As it was determined that Mother was entitled to appointed counsel, and as counsel essentially raises the sufficiency of the evidence, which is addressed by the trial court in its opinion, we consider Mother's counseled statement.

[8] We observe that Mother states her issues somewhat differently than in her Rule 1925(b) statement. We, nevertheless, find that Mother has preserved her challenges to the trial court's order.

the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting ***Matter of Adoption of Charles E.D.M., II***, 550 Pa. 595, 601, 708 A.2d 88, 91 (1998)).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b) (bold in original).

We first address whether the trial court abused its discretion by terminating Mother's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

In the case at bar, in finding grounds for termination, the trial court reasoned as follows:

In the present matter, Dr. Russell testified Mother had been receiving mental health treatment through medication management since 2014 and re-engaged [in] treatment in 2017. Dr. Russell testified [to] Mother's treatment plan for her pattern of unstable relationships, pattern of intense anger[,] and mood swings. Furthermore, Dr. Russell testified Mother had a very unstable developmental history and a pattern of discontinuing her medication and weekly individual therapy. Dr. Russell testified Mother manifested the unstable behaviors of intense anger,

- 12 -

unstable relationships[,] and impulse without [the] treatment supports of medication. Dr. Russell testified the treatment plan recommendations for Mother [were] to demonstrate and develop skills to provide herself with stable constant housing, maintain employment[,] and provide herself with a stable living environment. Furthermore, Dr. Russell testified his professional concerns [were that] the amount of treatment progress of Mother [] would not provide safety, stability[,] and permanency for J.F.W. Dr. Russell testified Mother still required ongoing treatment for a minimum of at least 12 to 18 months.[9]

. . .

As of the August 17, 2017[,] hearing, J.F.W. had been in care for at least nine (9) months. The social worker testified J.F.W. had been in custody of DHS since her birth. Mother failed [to] meet her Family Single Plan (FSP) permanency objectives in a way that would permit reunification to occur. The social worker testified Mother visited the agency displaying hostile behavior and foul language. The social worker testified Mother demonstrated a lack of stability to manage her behaviors. . . . Furthermore, the social worker testified in light of interaction with the agency there were overall concerns about Mother's stability to manage her behaviors even in a supervised visitation setting.

T.C.O. at 6-7 (citations to record omitted) (footnote added).

Further, in rendering its determination on the record at the conclusion of the hearing that grounds existed to terminate Mother's parental rights to Child, the trial court stated:

---

9 While it is unclear if this paragraph was intended to be read with Section 2511(a)(1) or (a)(2), regardless, we find it applicable to Section 2511(a)(2). In so finding, we further recognize the trial court's on-the-record discussion, included below, which relates similar thoughts. Moreover, as to subsection (a), we observe that, although the trial court discusses subsections (a)(1), (a)(5), and (a)(8), its order only terminated Mother's parental rights pursuant to subsection (a)(2).

Dr. Russell is not only the head clinician at ATA but he [is] the supervisor of Ashley Guy who has been noted as being [Mother's] treating therapist.

Dr. Russell provided clear testimony and indicated that since March 2017, this year, [M]other has consistently been treated. Miss Guy has actually been treating [Mother] since 2014. He indicated that there's ongoing treatment because [Mother] has a diagnosis of mood disorders and personality issues. And he described, as he did in the adjudicatory[,] about the long history in level of compliance as to [Mother] in terms of engaging in mental health services.

He described [Mother's] behavior when she's not appropriately engaging in therapy, psychotropic medications, as unstable, there's mood swings, that there's intense episodes of anger, impulsivity behaviors that arise when she's not appropriately on medication.

And the last time he described such behaviors was when she was pregnant with [Child]. [Child] was born in January 2017, this year.

I asked Dr. Russell, currently it's come to the [c]ourt's attention that [Mother's] currently pregnant, and are there any concerns about her possibility of not being on the appropriate medication to address her mental health concerns, and he said, indeed, that he has seen [Mother] go through periods of instability in terms of her behaviors when she's not.

To corroborate that we had the testimony of [Mother] who indicated that she indeed had a single case plan meeting in which [M]other interrupted and concluded by saying, you all can burn in hell. [Mother] admits to that today.

At every listing I have to be able to assess the demeanor of the witnesses. I absolutely find Dr. Russell to be credible. The most compelling thing said this afternoon about this matter pertaining to [Mother], Dr. Russell indicated that he did not believe that [Mother] can provide safety and stability for a child at this time.

And he said at best if she continued with weekly therapy and at the conclusion of her pregnancy, got back on medication, he

- 14 -

projected maybe, maybe 12 to 18 months she would be able to do something.

I submit that unfortunately, while [M]other is very upset about, you know, the history that's presented, the only thing the [c]ourt can rely on is, [*sic*] the information that has been provided. And it's been well documented about the extreme mental health concerns that [Mother] has.

So, absolutely, the [c]ourt would be concerned about that. I'm just looking at the short term and I would submit to you that reunification won't be viable today because [Child] could not be reunified with [Mother] because there's grave safety concerns and stability concerns.

So, therefore, I do find the Department has met its burden of proof. And I do believe that at this time it would be appropriate to involuntarily terminate the rights of [Mother] to [Child].

N.T. at 49-51.

Mother, however, argues that she achieved stability as it relates to her mental health and was in the process of obtaining housing. Mother's Brief at 11. We disagree.

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2). The record reveals that, despite current treatment, Mother failed to alleviate concerns with regard to mental health and lacked a protective capacity. As we discern no abuse of discretion or error of law, we do not disturb the court's findings.

Dr. Williams testified that Mother began treatment in 2014 for a mood disorder and related personality issues.[10]  N.T. at 14-15.  However, from October 2014 to June 2015, Mother attended "spottily," attending only 15 sessions.  *Id.* at 14.  Moreover, Mother had to discontinue medication management due to pregnancy.[11]  *Id.*  Dr. Williams related that Mother re-engaged in treatment in March 2017 and has been attending weekly therapy sessions.  *Id.* at 17.  Nevertheless, due to another pregnancy, Mother has again ceased medication.  *Id.*  Dr. Williams indicated that he convinced Mother to continue with the therapy, despite the stop in medication.  *Id.* at 20-22.  Notably, Dr. Williams reported that Mother has a history of anger and impulsive and unstable behavior when she is off her medication.  *Id.* at 18.

Significantly, Dr. Williams opined that Mother is still not able to provide safety and permanency for Child.  *Id.* at 24.  He testified as follows:

Q.   And at this point do you have professional concerns in regards to the amount of progress that she's made in treatment being sufficient to provide to be able to provide permanency and safety to [Child] as of today?

A.   I believe she has made progress and it's commendable, however, she's still not in my professional opinion able to provide safety and permanency to a child.

---

[10] Dr. Williams noted the importance of skilled and trained therapists to treat these issues as the treatment for these issues is long-standing and extensive. N.T. at 15-16.

[11] Dr. Williams related that Mother was participating in a surrogate pregnancy during this time-period.  *Id.* at 14.

*Id.* Dr. Williams further expressed that, while Mother has made progress, there is still difficulty translating the therapy into actions or behavior. *Id.* at 17. He stated,

> Given an understanding of how long standing these issues are, that the treatment would be a long standing treatment, she is beginning to be able to discuss very adequately healthy relationships, healthy behaviors. She's able to verbalize a much better frame of mind. There's still significant difficulty taking that verbal discussion and putting it into action. There's still a pattern of unstable relationships, a pattern of intense anger, mood swings. . . .

*Id.* at 17. Further, Dr. Williams would expect it to take 12 to 18 more months before such an ability begins to emerge.

> [I]t would be a period of no less than 12 to 18 months before we would begin to see the talk piece of the therapy start to be seen in actions, that is, her developing more stable self[-]image, her being able to control her anger in situations that she previously would get angry or have a mood swing. It would take that period of time before we begin to see it.

*Id.* at 29. Subsequent to evaluation, Dr. Williams confirmed his recommendation of "a network of appropriate supports as well as consistent employment and stable residence." *Id.* at 22. He noted a lack of stability as to housing and employment, and that Mother's chief source of current support was her aunt. *Id.* at 23.

Similarly, the CUA case manager, Siretta Humphrey, testified to concerns as to Mother's stability and mental health. N.T. at 37. She recounted an incident of Mother cursing and slamming a door at a single case plan meeting and expressed concerns as to Mother's ability to manage her

behavior. *Id.* She also relayed concerns about Mother's inability to take her medication due to her pregnancy. *Id.* As a result, Ms. Humphrey did not recommend reinstatement of visitation. *Id.* Further, Mother has not reached out and provided documentation regarding mental health or other services, such as housing. *Id.* at 37-38. Moreover, when Ms. Humphrey contacted Mother with regard to Child's birth certificate, Mother "hung up the phone." *Id.* at 37. Lastly, Ms. Humphrey offered testimony as to Mother's actions to attempt to contact Father and his family and see Child, which violated the order suspending her visitation. *Id.* at 35, 39-40.

As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for her physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation. *See id.*

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23

- 18 -

Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent[.]

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that termination of Mother's parental rights favors Child's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated as follows:

> Pursuant to Section 2511(b), the trial court must take account whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship. [*In re C.S.*], 761 A.2d 1197 (Pa. Super. 2000). Herein, the testimony of the social worker established that J.F.W. would not suffer any irreparable emotional harm if Mother's parental rights were terminated. Testimony of the social worker stated J.F.W. did not have a bond with Mother[.] Furthermore[,] the social worker testified J.F.W.'s foster parent has been successful and adequately providing for J.F.W.'s day[-]to[-]day needs. The social worker testified adoption was in J.F.W's best interest.
>
> The [c]ourt found the testimony of Dr. Russell to be credible. The [c]ourt did not believe Mother could be reunified with J.F.W. due to the grave safety and stability concerns. The [c]ourt found convincing Dr. Russell's testimony of Mother's diagnosis of mood disorders and personality issues, unmedi[]ated impulsivity behaviors and lack of compliance with mental treatment convincing and compelling[.] Furthermore, the [c]ourt reasoned J.F.W. never resided with Mother and was placed in a loving and nurturing stable home committed to permanency for J.F.W. Hence, the [c]ourt concluded the J.F.W.'s goal for permanency would be changed to adoption.

T.C.O. at 7-8 (citations to record omitted).

Further, the trial court reasoned on the record:

> So, the [c]ourt has taken in 2511 B testimony, and [Child] has never resided with [Mother], has been in the home that has been committed to permanency for this child. Mother has never had an opportunity to deal with the day-to-day needs of this child. This

child is currently in a loving and nurturing home and a home that can provide stability for her.

N.T. at 51-52.

Mother, however, argues that "there was insufficient evidence to establish that it was in the best interest of the child to be adopted." Mother's Brief at 12. Mother takes issue with the fact that the trial court found no bond between her and Child based upon the testimony of the agency worker only. Mother notes that no bonding evaluation was performed. *Id.* at 12-13. We disagree.

Upon review, we discern no abuse of discretion. The record supports the trial court's finding that Child's developmental, physical, and emotional needs and welfare favor termination of Mother's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of Child's needs and welfare, and as to the lack of a bond between Mother and Child, determine that, if severed, it would not have a detrimental impact on Child.

Aside from the safety and permanency issues stated above, significantly, Child has been in care and out of Mother's custody her entire life. N.T. at 39. Moreover, while described as appropriate, Mother had only one two-hour supervised visit with Child in March 2017. *Id.* at 41, 44-45. As such, the CUA case manager, Ms. Humphrey, opined that no parent-child bond existed between Mother and Child. *Id.* at 38. Ms. Humphrey indicated that Child does not depend on Mother for stability or support. *Id.* Likewise, Child

does not depend on Mother for her day-to-day needs. *Id.* Rather, Child is being appropriately cared for in her foster home. *Id.* at 40. Moreover, Ms. Humphrey confirmed a lack of negative behavior as a result of Child's removal from Mother. *Id.* at 39. Therefore, Ms. Humphrey further offered that there would be no irreparable harm to Child if Mother's parental rights were terminated, *id.* at 38, and that it would be in Child's best interests to be freed for adoption, *id.* at 39.

Thus, as confirmed by the record, termination of Mother's parental rights serves Child's developmental, physical and emotional needs and welfare and was proper pursuant to Section 2511(b). While Mother may profess to love Child, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. Child has been in care her entire life, and she is entitled to permanency and stability. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/30/18